In re Robert A. STEINBERG, Debtor.

IMPERIAL MILLWORK, INC., Plaintiff,

v.

Robert A. STEINBERG and Robert Braunstein, Trustee, Defendants.

Bankruptcy No. 79–01975–HL.

Adversary Proceeding No. 80–0010.

United States Bankruptcy Court,
D. Massachusetts.

June 9, 1980.

Joseph M. Murray, Plymouth, Mass., for plaintiff.

Charles D. Mulcahy, Henry C. Ellis, Assiran & Ellis, Taunton, Mass., for defendants and Debtor.

## MEMORANDUM ON DISCHARGE

HAROLD LAVIEN, Bankruptcy Judge.

On the plaintiff's complaint objecting to discharge, the following facts are not in dispute and are so found.

The debtor and his attorney were aware that the plaintiff-creditor, Imperial Millwork, Inc., ("Imperial") had obtained a judgment and execution in the amount of $5,416.97 which it sought to levy on the debtor's home and the collection of which it was pursuing vigorously. The creditor's failure to collect on the original levy was occasioned by the fact that the home produced no surplus over the foreclosing mortgage. Counsel for the creditor then sought other property on which to levy. The debtor at that time held four other properties then under contract to various purchasers and also held an unencumbered vacant lot. Imperial was initially unaware of these properties. The debtor's attorney feared that as soon as the creditor became aware of these four houses the creditor would attach them and thereby prevent the debtor from conveying them to the purchasers who had already invested substantial money, including deposits. In order to forestall attachment by the plaintiff until the conveyances could be completed, the four lots were conveyed by the debtor to his attorney for the nominal consideration of one dollar. No similar conveyance was made of the unencumbered lot. The deeds were promptly and properly recorded—all at a time when the debtor was hopelessly insolvent. Shortly thereafter, when the details of the various conveyances were arranged, the debtor's attorney reconveyed to the debtor who then conveyed to the third-party buyers. The conveyance of the four lots to the debtor's attorney took place on April 18, 1979. The attorney-grantee [1] stated at the pre-trial conference, at several motion sessions, and both the attorney and the debtor testified at the trial that the purpose of the transfer to the attorney was to prevent a subsequent levy by Imperial so that the debtor could complete both the construction of the homes and the sales to the prospective buyer in accordance with the existing purchase and sale agreements under which

---

1. The attorney was advised by the court at the pre-trial conference that insofar as he might become personally involved and would quite probably be a witness, that he might desire counsel, or at least there should be other trial counsel. *See* Canon 5, Code of Professional Responsibility; D.R. 5–102(A). At trial, the attorney withdrew and new trial counsel presented the case.

the debtor had already received $48,811. in deposits and advances.

The debtor's attorney then conducted intensive negotiations which resulted in both a written agreement dated May 13, 1979 but not fully executed until May 15th between the four buyers, the debtor, and the real estate broker, and a purported oral agreement with the third and fourth mortgagees as to the amount for which they would release their mortgages. The first mortgage was to be paid in full and the buyers were to purchase an assignment of the second mortgage. Simultaneous with the written agreement on May 15 the attorney reconveyed the 4 lots to the debtor who conveyed them to the purchasers who had agreed to complete the payments under the original purchase and sale agreements plus pay the debtor, and others, additional amounts to complete the houses. The net result was payment by the four buyers of the original purchase price of $223,525. plus an additional $19,573.83.

The first and second mortgagees were both paid in full, $122,509.93 and $11,077.22 respectively. The third mortgagees were paid $4,650. on a $6,000. claim and the fourth mortgagee received $4,500. on a $22,629.71 claim.

On October 24, 1979, the debtor filed a voluntary petition in bankruptcy.

Imperial objects to the discharge of the debtor pursuant to the provisions of sections 727(a)(2)(A) and 727(a)(4)(A) of the Bankruptcy Code. The pertinent provisions provide as follows:

727 DISCHARGE

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . , or has permitted to be transferred . . .

(A) property of the debtor, within one year before the date of the filing of the petition

\* \* \* \* \* \*

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

The court will first address the issue of the purported false oath. In answer to question 14b on the statement of affairs, the debtor stated that he had made no transfer or other deposition of property not in the ordinary course of business during the year preceding the filing of his petition. Obviously, that answer was false. The creditor points to an early draft of the answers prepared by the debtor's attorney which listed the transfers of the four lots in question. The answer is crossed-out and the answer "none" appears on the statement of affairs filed with the court. According to Imperial, this change of answers demonstrates both knowledge and a deliberate false answer. I find the explanation offered by the debtor's attorney to be credible even though mistaken. The attorney testified that he first listed the sales and later decided that, because the debtor was engaged in the business of building and selling houses, these sales were in the ordinary course of business. In response to questioning regarding the transfer of the properties to himself, the attorney stated that at the time he completed the schedules he simply failed to consider that transfer. Of course, this transfer was the type of transfer that the question was designed to reveal so as to discover any concealed assets. However mistaken the debtor was in relying on his attorney in answering this question, I find that neither the debtor nor his attorney were knowingly and fraudulently making a false statement.

Clearly, however, the conveyance to the attorney was made with a deliberate intent to hinder and delay this creditor. The debtor cites the case of *Devorkin v. Security Bank & Trust Co.*, 243 F. 171 (6th Cir. 1917) and argues that as a matter of law the transfer to his attorney may not be the basis for denial of discharge unless the creditor was or could have been injured by the transfer. The debtor further argues that because the secured indebtedness as of April 18, 1979 was $162,216.86 and the appraised value of the properties was $139,-

600, there was no equity which could be attached and, therefore, no creditor could complain of actual harm.

The initial appeal of this argument does not withstand close scrutiny on either its legal or factual underpinnings. Although perhaps not terribly significant, the important date is not April 18, 1979 but rather is anytime between that date and May 15, 1979 when the property was reconveyed to the debtor and then transferred to the ultimate purchasers. During that time period the attorney held the properties in absolute form but what actually existed was a secret trust—a badge of fraud. This fact presents one distinction from the *Devorkin* case, which concerned a mere preference which the plaintiff attempted to construe as an *intentional* fraudulent conveyance by means of a badge of fraud. In the present case both the debtor and his attorney freely admit that this conveyance was made deliberately to hinder and delay Imperial. Therefore, in the present case there is no need to imply intent—the intent is admitted.

Turning now to the specific facts, it appears that on May 15, 1979 the four buyers completed their purchases, or at least received title, and committed themselves to pay an amount which turned out to be $243,098.83. Clearly this amount does not reflect the fair market value of the properties at that time. All of the houses were in need of further work; indeed, lot # 2 contained little more than a foundation. Apparently, lots # 1, 3, & 4 were quite close to completion inasmuch as the May 13 agreement describes the remaining work on Lots 1 & 4 as "finish up all of the miscellaneous work" and uses their state of finish as the standard. Likewise, lot # 3 was to be completed on or before May 21 only 8 days after the agreement.

The appraiser used by the debtor concedes that although his appraisal was purportedly to be as of April 18, 1979, he did not visit the property at that time for the purpose of appraisal and made no personal notes. The appraisal was made one year later based upon notes of others regarding incomplete work. In contrast, the bank visited and inspected the premises prior to making advances on its construction loan. The mortgages held by the bank equaled only a portion of the purchase price of the houses. For example, lot # 3 carried a purchase price of $56,800. and was encumbered with a construction mortgage of only $36,000. Because advances were made by the bank based upon the stage of completion, the fact that $29,636. had been advanced on the $36,000. mortgage, would indicate that the property was approximately 75–80% complete. The appraisal of lot # 3 offered by the debtor was $25,100.—an amount less than the actual advances made by the mortgage. Utilizing the $56,800. purchase price and assuming 75–80% completion, a value of approximately $42,000. to $45,000. would appear to be more appropriate. In addition, the agreement of May 13 indicates that some expenditures were made and work performed between April 18, 1979 and May 13, 1979.

Should it be necessary, I would therefore find the value of the properties to be closer to $175,000. than the $139,600. appraisal offered by the debtor. Valuation, however, is at best an approximation and certainly no one dealing with the problem at the time of the conveyance of April 18 had a micrometer to measure exact values—nor did they have even the guidance provided by an appraisal. The appraisal on which the debtor relies was not made until 1980.

The determination of the 'fair valuation' of the debtor's assets at a specific time is at best an inexact science, and may often be impossible.

*Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980). The debtor and his attorney, however, did know at the time of entering into the May 13, agreement that out of the value of the houses, the buyers would be credited with $48,811 in deposits and advances, the brokers would receive $6,600, and there would be paid legal fees and costs of $2,200—none of which were secured and would not have preceded an attachment or levy by Imperial.

Thus the value of property is a reasonable enough bit of evidence in reaching a conclusion about fraud. *Baker v. Bishop-Babcock-Becker Co.,* [220 F. 657 (C.C. A.4); *Devorkin v. Security B & T Co.,*] 220 B. & T. Co., 243 F. 171 (C.C.A.6). But once the fraud be proved, it makes no difference that the creditors are not seriously injured, or that after bankruptcy the bankrupt might reclaim the property for a trifle. *In re Breitling,* 133 F. 146 (C.C.A.7); *Arenz v. Astoria Savings Bank,* 281 F. 530 (C.C.A.9); *Sinclair v. Butt,* 284 F. 568 (C.C.A.8); *In re Hirshowitz* (D.C.) 194 F. 562; *In re Smith* (D.C.) 232 F. 248, 254. Courts will not measure the dishonesty of a bankrupt, once that be shown; a discharge is a privilege granted only to such as do not practise on their creditors in any way. The law forbids all efforts to put property beyond the reach of creditors, no matter what its value; so long as courts are tolerant of such conduct, men will engage in it and the purposes of the bankruptcy act will be balked.

*In re Feynman,* 77 F.2d 320, 322 (2d Cir. 1935).

The debtor and his attorney transferred these properties to this attorney with the deliberate intent to hinder and delay this creditor's attempt to attach or levy on the property. This is both literally and in spirit inconsistent with the purposes of the Code and is an act proscribed by 11 U.S.C. Section 727(a)(2)(A).

The discharge of this debtor is denied.