In re W.B. KNOTT, Jr. and Virginia Sutherland Knott, Debtors.

CITIZENS BANK AND TRUST COMPANY, Plaintiff,

v.

W.B. KNOTT, Jr., Defendant.

Bankruptcy No. 82–01318–R.
Adv. No. 82–0344–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Aug. 9, 1983.

Alpha W. Walden, Blackstone, Va., for plaintiff.

C.J. Habenicht, Chester, Va., for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes on upon the filing by Citizens Bank and Trust Company of a complaint objecting to the dischargeability of the debtors' debt to the plaintiff (Count I) and a complaint objecting to the debtors' discharge in bankruptcy (Count II). After notice and hearing and upon the submission of briefs, this Court makes the following determination.

## STATEMENT OF THE FACTS

During the years 1974 through 1982 Citizens Bank and Trust Company (Citizens) extended approximately 24 loans to W.B. Knott, Jr. (Knott) and his wife, Virginia Sutherland Knott. During this period, Knott was engaged in farming and real estate speculation and at the time he filed

his petition in bankruptcy with this Court in October, 1982, only four loans extended by Citizens remained outstanding. Knott's indebtedness to Citizens on the date of bankruptcy is evidenced by four demand notes.[1]

| Demand Note Dated | Original Principal Due | Amount Due 8/82 |
| --- | --- | --- |
| October 15, 1979 | $28,000.00 | $20,508.59 |
| March 1, 1980 | 50,000.00 | 12,662.91 |
| July 13, 1980 | 25,000.00 | 6,255.42 |
| October 28, 1980 | 45,000.00 | 47,977.00 |

Citizens required Knott to submit yearly an updated financial statement which it used in determining what loans to extend to him. With the exception of a 1973 loan, Knott did not submit financial statements to obtain particular loans. Knott annually submitted a statement to Citizens and Citizens extended to him loans throughout the year. Knott submitted a financial statement to Citizens in December, 1979, which reflected that he owned 18 building lots in Bonneville subdivision. J.A. Wilson, Jr., the President of Citizens, was the sole employee of Citizens who dealt with Knott concerning these loans. When he received the financial statement in December, 1979, he perused it and sent it to another department in the bank to file it and note its expiration date.

In April, 1980, the bank transferred the information contained on the December, 1979, financial statement onto a new form and sent it to Knott for his signature. He signed the new financial statement and returned it to the bank.

Shortly before Knott submitted the December, 1979, financial statement to Citizens he and his wife transferred the 18 lots they owned in Bonneville subdivision to Landville Realty, Inc., a company which Knott formed in 1977 and whose stock at that time was owned entirely by Knott and his wife. The Knotts transferred their interest in the property to Landville Realty, Inc. because the lender which held a security interest in that property refused to extend or renegotiate the loan with the Knotts. Knott transferred the property to

1. The March, 1980, note and apparently the other three notes evidence the refinance of loans which existed prior to December, 1979. Citizens refinanced these loans at the higher interest rates which prevailed at the time.

the corporation in order that a new loan secured by that property could be made to the corporation and that the past due Knott loan could be satisfied from the proceeds. The December, 1979, statement inaccurately reflected, therefore, that Knott personally owned these properties.

The statement was allegedly false in two respects. The Bonneville property was owned by Landville Realty, Inc. Although some of the assets Knott listed were jointly owned, the financial statement appeared solely to be Mr. Knott's. Mr. Wilson, who was aware that the Knotts jointly owned the stock in Landville Realty, testified he considered Knott's financial statement to be solely that of Mr. Knott. The Bonneville lots when transferred to Landville Realty by the Knotts increased the value of Landville Realty, and, therefore, left unchanged the value of the Knotts' assets. During these periods the bank also received financial statements of the parents of Mr. Knott. This Court concludes that Wilson considered the financial statements to represent Mr. and Mrs. Knott's financial condition, particularly in light of the fact that the notes securing these debts were jointly executed by the Knotts.

After the Knotts transferred the 18 lots to Landville Realty, Inc., the property was refinanced through a loan obtained from First Colonial Savings and Loan. Knott in his December, 1978, financial statement listed 24 lots located in the Bonneville subdivision which he and his wife owned together. The December, 1979, financial statement reflected that only 18 lots remained at that time. Six of the lots had been sold. Wilson, however, failed to note this change in Knott's financial condition. Wilson testified that in examining the financial statement he compared the bottom line assets and liabilities and net worth of Knott and that he did not go through each category of property to examine the specific changes in Knott's financial condition. Knott made substantial payments on the interest and principal of these loans through 1980 and 1981.

Wilson was uncertain whether Citizens would have extended Knott any loans after December, 1979, if the financial statement submitted during that month by Knott had reflected that the 18 remaining properties located in the Bonneville subdivision had been transferred to Landville Realty, Inc. Wilson admitted that the three loans extended in 1980 which remained unpaid at the time the Knotts filed their petition in bankruptcy were all at least partially secured by deeds of trust on Knott's father's farm. Knott testified that he mistakenly included in his financial statement that he and his wife owned the 18 Bonneville lots in December, 1979, but that this mistake was unintentional. He further testified that because this property was transferred to a corporation of which he and his wife were the sole stockholders at the time, the transfer of the property had no real effect on his net worth. Although the property was refinanced, at the time of transfer to Landville the existing indebtedness and accrued interest owed by the Knotts and secured by the property was satisfied. Any cash realized from the refinancing became property of Landville.

At the time the Knotts filed their petition in bankruptcy, they omitted to state in their schedules that Knott was a part owner of certain real estate commonly known as the Stables property. Knott and two other individuals purchased this property in 1977, and Knott was a ⅓ owner. Between 1977 and 1982 approximately 7 acres of the original 34 acres were sold. Testimony at this hearing indicated the property was worth between $20,000.00 and $40,000.00. The appraisal of B.Z. Clark, a real estate appraiser who testified that the property was worth $40,000.00, is highly questionable because of his lack of knowledge concerning major attributes of the property and the values of comparable properties in the vicinity. Knott's ⅓ interest in this property was encumbered by a lien securing a loan by W.D. Allen in the amount of approximately $6,500.00. The Knotts filed their bankruptcy petition shortly after an interrogatory hearing was held on August 2, 1982, in which the Knotts were questioned concern-

ing the Stable property. Counsel for the bank in the instant proceeding also represented Citizens at the interrogatory hearing and Knott was consequently aware the bank knew he owned an interest in the Stables property at the time he filed his petition in bankruptcy.

## CONCLUSIONS OF LAW

In this adversary proceeding Citizens' request for relief is two-fold. First, Citizens alleges that Knott with the intent to deceive Citizens furnished Citizens a false financial statement dated December 1, 1979, on which Citizens reasonably relied and extended credit in March, July, and October, 1980. Second, Citizens contends that at the time Knott filed his petition in bankruptcy he omitted from his bankruptcy schedules certain real estate located in Dinwiddie County, Virginia in which he owned a ⅓ interest. Citizens contends that Knott sought by concealing this property to hinder, delay, and defraud his creditors and, therefore, Citizens seeks a denial of the debtors' discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(4).

■ A debt created by the extension of credit based upon the submission of a financial statement may be rendered nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(A) provided that the objecting creditor can show the existence of each of the following elements.

(1) the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as a result of the representations having been made."

*Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967). Courts must strictly construe the exceptions to dischargeability set forth in 11 U.S.C. § 523(a)(2). *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). Furthermore, the objecting creditor must prove the existence of each of these elements by clear and convincing evidence. *Brown v. Buchanan,* 419 F.Supp. 199 (E.D.Va.1975).

■ In the instant case this Court can find sufficient evidence to show the existence of only the first element in the *Sweet* test. From the testimony proffered at trial, it appears that Knott unknowingly failed to reflect on his financial statement the transfer of the 18 lots in the Bonneville subdivision to Landville Realty. Furthermore, it appears that property was transferred to a corporation of which he and his wife were the sole owners. He and his wife were obligated on the notes held by Citizens. In effect they still retained their interest in those lots as stockholders of the corporation. The transfer was hardly more than a change in form rather than substance. Because Knott was unaware of the inaccuracy of the financial statement, this Court cannot find that Knott issued it with the intention or purpose of deceiving Citizens.

From the evidence proffered at trial, this Court cannot conclude that Citizens relied on Knott's representations that he owned the 18 lots in the Bonneville subdivision when it authorized the extension of the three loans in 1980. Wilson's testimony indicated that Knott's submission of the financial statements was pro forma and may have had little or no effect on Citizens' extension to him of credit. Wilson acknowledged that he failed to note on the 1979 financial statement that Knott had transferred six of the lots located in the Bonneville subdivision. Wilson testified that he was in charge of the Knott account and that no other employee of the bank was involved in the extensions of credit to Knott. Wilson further acknowledged that his examination of Knott's financial statements was little more than a perusal. After examining the financial statements he sent them to other departments to be filed so that those departments would know when to expect submission of the next

year's financial statement.[2] Finally, Wilson admitted that he was uncertain whether Citizens would have refused to extend Knott further credit if the 1979 financial statement had accurately reflected that the 18 lots had been transferred to Landville Realty.

Citizens was aware at the time it extended Knott the 1980 loans that Knott was experiencing a cash flow problem. As a result Citizens asked for and received deeds of trust on Knott's father's farm which at least partially secured these loans.

Because this Court can find neither that Knott intentionally executed a false financial statement or that Citizens relied on that financial statement when it extended Knott three loans in 1980, this Court must deny that portion of Citizens' complaint which relates to the dischargeability of these debts.

■ This Court must also deny Citizens' complaint objecting to the debtors' discharge in bankruptcy. Citizens contends that this Court should deny Knott a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2) because the debtor concealed real estate located in Dinwiddie County, Virginia, in which he owned a ⅓ interest by failing to reveal that property on his bankruptcy schedules. Citizens also contends that this Court should deny the debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(4) because the debtor knowingly and fraudulently made a false oath or account when he failed to report on his bankruptcy schedules his part interest in the Dinwiddie County real estate. Whether

the Dinwiddie County property is valued at $40,000.00 as the plaintiffs submit or at $20,000.00 as the defendants submit, is irrelevant in this proceeding. The law forbids fraudulent concealment of property notwithstanding its value. See, *In re Steinberg,* 4 B.R. 593, 597 (Bkrtcy.D.Mass.1980). However, both of these subsections require that the debtor commit the act of concealment or the issuance of a false oath with a fraudulent intent. "This intent must be an actual fraudulent intent as distinguished from constructive intent." 4 *Collier on Bankruptcy,* § 727.02[3] (15th ed. 1983); see, *In re Tuttle,* 15 B.R. 14 (Bkrtcy.D.Kan. 1981).

■ In the instant case the evidence suggests Knott was careless and did not intend to defraud the bank. Knott was questioned thoroughly about the existence and value of the property by Citizens' counsel at a proceeding conducted pursuant to the law of the Commonwealth of Virginia held immediately prior to his filing his petition in bankruptcy. As a result of that examination, Knott and his wife hastily filed a bankruptcy petition in which he omitted to list this property. After questioning at the creditors' meeting required by 11 U.S.C. § 341 by counsel for Citizens, Knott amended his schedules and listed this property. These facts corroborate Knott's testimony that the omission of this property was unintentional. *See e.g. Terkel,* 7 B.R. 801, 803 (Bkrtcy.S.D.Fla.1980).

Citizens cites *In re Mazzola,* 4 B.R. 179 (Bkrtcy.D.Mass.1980) for the proposition

---

**2.** Direct Examination: T–29

Q. Mr. Wilson, when you received the December, 1979 statement, what did you do if anything, with it?

A. I reviewed it and probably compared it with his previous statement and then gave it to the Note Department for them to set up a card file . . . .

Cross Examination: T–52

Q. It [1978 financial statement] listed 24 lots in Bonneville Subdivision on that financial statement, did it not?

A. I think that is right.

Q. The financial statement given to you on December 1, 1979 listed the 18 lots?

A. Yes.

Q. You never picked that up, did you?

A. No, well, the overall net worth increased during that time.

Q. But you never picked up that fact that six of the lots had been transferred, did you?

A. I didn't notice that, no, because the net worth increased from one statement to the other.

Q. So there would be a change in the assets, you didn't compare the assets shown in the 1979 statement line for line with the assets shown on the '78 statement, did you?

A. No.

Q. You looked at the bottom line assets and liabilities and net worth?

A. Yes, that was the main thing.

that proof of actual fraudulent intent is not necessary to bar a discharge in bankruptcy where the debtor's "... reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering [rises] to the level of fraudulent intent necessary to bar a discharge." In *Mazzola,* the debtor's schedule of affairs contained numerous false statements which were clearly designed to conceal the debtor's sale of certain property and deposit of the cash receipt from that sale in a checking account for a corporation in which the debtor was the sole stockholder. In *Mazzola,* the Court concluded that the debtor's false statements constituted a link in a cover-up of the debtor's financial transactions. *Mazzola* at 183. In the instant case there is no evidence of a series of fraudulent activities which could lead this Court to view the debtor's omission of this property from his schedules in a less favorable light. Although Knott's carelessness is inexcusable, it does not rise to the level necessary for this Court to deny him his discharge in bankruptcy.